# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

EDWARD PIOTROWSKI,

        Plaintiff,

      v.                                    **Case No. 17-CV-1286**

NANCY A. BERRYHILL,
    *Deputy Commissioner of Operations,*
    *Social Security Administration,*

        Defendant.

---

## DECISION AND ORDER REVERSING THE COMMISSIONER'S DECISION AND AWARDING BENEFITS

---

Edward Piotrowski alleges that he is unable to work due to a left upper-extremity impairment and neck and back issues. After the Social Security Administration denied his application for disability benefits, Mr. Piotrowski requested and received a hearing before an administrative law judge. The ALJ determined that Mr. Piotrowski remained capable of working notwithstanding his impairments. Mr. Piotrowski now seeks judicial review of that decision.

Mr. Piotrowski argues that the ALJ erred in determining that he had the residual functional capacity to engage in frequent handling with his left upper extremity. The Commissioner contends that the ALJ's RFC assessment is supported by substantial evidence. The Court agrees with Mr. Piotrowski. Because the ALJ's RFC assessment is not supported by substantial evidence, her decision denying

Social Security benefits to Mr. Piotrowski will be reversed. Moreover, because all factual issues have been resolved and the record supports only one conclusion—that Mr. Piotrowski is disabled—this matter will be remanded to the SSA for an award of benefits.

## I.    Background

Edward Walter Piotrowski was born on October 15, 1969. Transcript 39, ECF Nos. 7-2–7-21. After graduating high school and starting college, he accepted a job doing maintenance work for the Skokie Park District in Illinois. Tr. 39. He worked there for a number of years before leaving in 1999 to become a delivery-truck driver for a food company. Tr. 77–79. In 2001, Mr. Piotrowski returned to park maintenance, this time with the Arlington Heights Park District. Tr. 41, 77, 208. His responsibilities included maintaining athletic fields, landscaping, general custodial work, and snowplowing. Tr. 41–44. Consequently, this position required a good deal of walking, standing, stooping, kneeling, crouching, and handling large objects. Tr. 42–42, 47–49, 208–09.

In 2007, Mr. Piotrowski tore his left biceps tendon lifting trees at work. Tr. 808. At work a few months later, he slipped on ice and fell onto his outstretched left arm. Tr. 458. X-rays of the elbow showed no fracture, dislocation, subluxation, bony lesions, loose bodies, periarticular calcifications, or arthritis. Tr. 459. Nevertheless, Mr. Piotrowski—who is left-handed, Tr. 40, 235—continued to experience pain and weakness in his left shoulder and elbow. *See* Tr. 475, 485, 487. In January 2009, he underwent shoulder surgery, Tr. 509–10, and stopped working, Tr. 40–41, 45–46,

208. Mr. Piotrowski participated in physical therapy post-surgery, *see* Tr. 409, 563–65, 726–47, but his symptoms persisted, *see* Tr. 461–72, 477–84, 671–84. Eventually, Mr. Piotrowski had a second shoulder surgery in 2013. Tr. 713–17.

In early 2013, Mr. Piotrowski applied for disability insurance benefits, alleging that he became disabled on January 29, 2009, the date of his first surgery. Tr. 181–82. Mr. Piotrowski asserted that he was unable to work due to a torn left biceps tendon; nerve damage; a rotator cuff tear; lack of mobility in his left arm; pain, tingling, and numbness; sleeplessness; narcotic pain medication use; arthritis; and stomach issues. Tr. 207. After the SSA denied his application initially, Tr. 93–102, and upon reconsideration, Tr. 103–117, Mr. Piotrowski requested a hearing before an ALJ, *see* Tr. 137–39.

The SSA granted Mr. Piotrowski's request, *see* Tr. 140–67, 171–72, and held an administrative hearing on October 12, 2016, before ALJ Guila Parker, *see* Tr. 33–86. Mr. Piotrowski was represented by an attorney at the hearing. Tr. 33. Mr. Piotrowski testified that, at the time of the hearing, he was living with his wife in a rental condo. Tr. 39–40. His only child, a son, was a junior in college. Mr. Piotrowski indicated that he had not worked since late-2008 or early-2009 because of a left-arm injury. Tr. 40–41, 44–46. He reported that his symptoms had progressively worsened and that he had difficulty reaching, lifting, and holding objects. Tr. 46–54.

Mr. Piotrowski also reported experiencing stiffness, pain, and mobility issues in his neck and pain in his lower back. Tr. 54–59. According to Mr. Piotrowski, he could sit for about five minutes at a time before he started to fidget; he could stand

for up to thirty minutes before needing to sit; and he could walk for about one block. Tr. 59–63. Mr. Piotrowski indicated that his typical day involved taking care of his personal needs, preparing simple meals, washing dishes, doing laundry, vacuuming, driving, and watching and listening to sports. Tr. 68–71. He explained, however, that he took his time loading and unloading the dishwasher, he didn't fill up the basket when doing laundry, he used his right hand to vacuum, he had difficulty turning his head while driving, and he could no longer play sports or garden.

The ALJ also heard testimony from Carly Coughlin, a vocational expert. Ms. Coughlin testified that a hypothetical individual with Mr. Piotrowski's age, education, and work experience would not be able to work if he were limited to a restricted range of light work, including only occasionally (up to one-third of the time) handling[1] with the left (i.e., dominant) upper extremity. Tr. 80. If that individual were instead limited to frequently (from one-third to two-thirds of the time) handling with the left upper extremity, he could not perform his past jobs as a park worker or a stocker, but he could work as an office helper, a housekeeper, or a hand packager. *See* Tr. 76–77, 79–82. According to Ms. Coughlin, all work would be precluded if the individual were regularly and consistently absent more than once per month, had to leave work two or three times per week for physical therapy, or were off-task more than ten percent of the workday. Tr. 82–84.

---

[1] "Handling" means "[s]eizing, holding, grasping, turning, or otherwise working with hand or hands." *See* United States Department of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, C-3 (4th ed. 1993), *available at* onlineresources.wnylc.net/docs/SelectedCharacteristicsSearch121110.pdf.

On January 13, 2017, the ALJ issued a decision unfavorable to Mr. Piotrowski. Tr. 12–32. The ALJ determined that (1) Mr. Piotrowski met the insured status requirements of the Social Security Act on September 30, 2014; (2) Mr. Piotrowski had not engaged in substantial gainful activity during the period from his alleged onset date through his date last insured; (3) through the date last insured, Mr. Piotrowski suffered from the following "severe" impairments: rotator cuff tendinopathy, arthritis, and impingement syndrome of the left shoulder; degenerative disc disease of the cervical and lumbar spine; status post left biceps tendon repair with subsequent neuropathic pain; chronic left lateral epicondylosis; and obesity; (4) through the date last insured, Mr. Piotrowski did not suffer from an impairment or combination of impairments that met or medically equaled the severity of a presumptively disabling impairment; (5) through the date last insured, Mr. Piotrowski had the RFC to perform a restricted range of light work; (6) through the date last insured, Mr. Piotrowski was unable to perform any past relevant work; and (7) through the date last insured, other jobs existed in significant numbers in the national economy that Mr. Piotrowski could perform. *See* Tr. 15–27. Based on those findings, the ALJ concluded that Mr. Piotrowski was not disabled.

Thereafter, Mr. Piotrowski requested review of the ALJ's decision by the SSA's Appeals Council. Tr. 180. On August 9, 2017, the Appeals Council denied Mr. Piotrowski's request for review, Tr. 1–6, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

Mr. Piotrowski filed this action on September 25, 2017, seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). Complaint for Review of a Final Decision By the Commissioner of the Social Security Administration, ECF No. 1. The matter was reassigned to this Court after the parties consented to magistrate judge jurisdiction. *See* Order Reassigning Case on Consent, ECF No. 9; *see also* Consent to Proceed Before a Magistrate Judge, ECF Nos. 5, 8 (citing 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b)). It is now fully briefed and ready for disposition. *See* Plaintiff's Brief, ECF No. 12; Defendant's Memorandum in Support of the Commissioner's Decision, ECF No. 20; Plaintiff's Reply, ECF No. 21.

## II.     Standard of Review

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. This statutory power "includes the courts' ability to remand with instructions for the Commissioner to calculate and award benefits to the applicant." *Allord*, 631 F.3d at 415 (citing *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)). "An award of benefits is appropriate, however, only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord*, 631

F.3d at 415 (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005)).

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

In reviewing the record, this Court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) and *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). The ALJ's decision must be reversed "[i]f the evidence does not support the conclusion." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569). Likewise, reviewing

courts must remand "[a] decision that lacks adequate discussion of the issues." *Moore*, 743 F.3d at 1121 (citations omitted).

Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if her decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

## III. Discussion

Mr. Piotrowski maintains that "[t]he conclusions and findings of fact of the [Commissioner] are not supported by substantial evidence and are contrary to law and regulation." Compl. ¶ 7. He asks the Court to reverse the ALJ's decision and award benefits or, alternatively, to remand the matter for a further hearing. Compl. p. 2.

### A. Legal framework

Under the Social Security Act, a person is "disabled" only if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."

*See* 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). The disability must be sufficiently severe that the claimant cannot return to his prior job and is not capable of engaging in any other substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

In determining whether a person is disabled, the SSA must follow a five-step sequential evaluation process, asking, in order: (1) whether the claimant has engaged in substantial gainful activity since his alleged onset of disability; (2) whether the claimant suffers from a medically determinable impairment or combination of impairments that is severe; (3) whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of any impairment listed in the SSA regulations as presumptively disabling; (4) whether the claimant's RFC leaves him unable to perform the requirements of his past relevant work; and (5) whether the claimant is unable to perform any other work. *See* 20 C.F.R. § 404.1520(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Briscoe*, 425 F.3d at 352. "The claimant bears the burden of proof at steps one through four." *Id.* (citing *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004)). Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## B. Legal analysis

Between steps three and four of the sequential evaluation process, the ALJ must determine the claimant's RFC—that is, the most he can do despite his physical and mental limitations. 20 C.F.R. § 404.1545(a)(1); *see also* Social Security Ruling No. 96-8p, 1996 SSR LEXIS 5, at *5 (July 2, 1996). ALJs must assess a claimant's RFC "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'" SSR No. 96-8p, 1996 SSR LEXIS 5, at *5–6; 20 C.F.R. § 404.1545(a)(3). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR No. 96-8p, 1996 SSR LEXIS 5, at *19. "The [ALJ] must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

The ALJ here determined that, through his date last insured, Mr. Piotrowski had the RFC to perform less than the full range of light work.[2] Specifically, she concluded that Mr. Piotrowski could use his right (i.e., non-dominant) upper extremity as the primary to lift and carry, with assistance from his left upper extremity; could never climb ladders, ropes, or scaffolds; could occasionally stoop

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b)

and crouch; could never work at unprotected heights or around dangerous moving machinery; could have only occasional exposure to vibration; and could frequently handle with the left upper extremity. *See* Tr. 18–25.

Mr. Piotrowski argues that the ALJ's finding that he could frequently use his left upper extremity for handling is not supported by substantial evidence. According to Mr. Piotrowski, the ALJ disregarded evidence—including the opinions of his treating physician and the state agency medical consultants—that showed he could only occasionally use his left arm. Mr. Piotrowski also maintains that the ALJ mischaracterized his activities of daily living and hearing testimony. *See* Pl.'s Br. 25–30; Pl.'s Reply 1–3.

The Commissioner argues that the ALJ's RFC assessment is supported by the objective medical evidence and Mr. Piotrowski's daily activities. *See* Def.'s Mem. 3–6. Furthermore, according to the Commissioner, the ALJ reasonably evaluated the opinion evidence contained in the record. *See* Def.'s Mem. 6–10.

For the reasons explained more fully below, the Court finds that the ALJ's frequent-handling finding is not supported by substantial evidence. The record contains objective evidence that both bolsters and undermines that finding, but Mr. Piotrowski's reported activities and the opinion evidence show that he is more limited in his ability to use his left upper extremity than acknowledged by the ALJ. Thus, the evidence cited by the ALJ is not adequate to support her conclusion.

### 1. Objective medical evidence

In November 2008, Mr. Piotrowski underwent an MRI of his left shoulder after injuring it at work. Tr. 525–26. The MRI revealed supraspinatus tendinosis without evidence of full thickness rotator cuff tear and degenerative changes of the acromioclavicular joint. Two months later, Mr. Piotrowski had surgery on his left shoulder. Tr. 509–10. A follow-up MRI revealed post-surgical changes to the shoulder; no evidence of full thickness rotator cuff tear; tendinopathic changes in the supraspinatus, infraspinatus, and subscapularis tendons; a possible tiny intrasubstance tear of the infraspinatus tendon; no evidence of an acute tear involving the biceps tendon or labrum; and capsulitis. Tr. 523–24. An independent medical examiner characterized these findings as "unremarkable." *See* Tr. 501.

While recovering from the shoulder surgery, Mr. Piotrowski developed issues with his left elbow. An MRI in May 2009 revealed a partial tear of the supinator muscle, possible mild inflammation, and a small joint effusion but no nerve entrapment. Tr. 521–22. The following month, a physical examination of Mr. Piotrowski's left shoulder showed tenderness; mild palpable crepitations; pain with rotation, abduction, and flexion; no atrophy; 5/5 strength; normal muscle tone; and negative special tests. With respect to his left elbow, the exam showed no swelling; no deformities; no joint effusion; no crepitation; tenderness at the ulnar nerve, medial elbow, and anterior elbow; pain with supination and pronation; 5/5 strength; normal muscle tone; and no atrophy. Tr. 468–70. Treating physician Matthew A. Bernstein, M.D., indicated that Mr. Piotrowski had a poor prognosis for his elbow

impairment because additional surgery was not likely to alter his symptoms. Tr. 467. He ordered a functional capacity evaluation, Tr. 467, and referred Mr. Piotrowski to pain management, Tr. 470.

Mr. Piotrowski appeared for the Functional Capacity Evaluation in August 2009. He demonstrated good strength and use of his right upper extremity but moderate weakness in his left shoulder and mild weakness in his left biceps. He experienced left shoulder pain with lifting, carrying, pushing, and pulling weights over fifteen pounds. Tr. 535–36.

The record reflects that Mr. Piotrowski was seen at pain management from August 2009 through February 2010. Treatment notes reveal, at worst, moderate tenderness in his left shoulder and elbow. *See* Tr. 671–84.

In October 2009, Mr. Piotrowski participated in an electromyography/nerve conduction (EMG/NCV) study. The study revealed abnormalities of the left lateral antebrachial cutaneous sensory nerve but was otherwise "normal." Tr. 591–97. Dr. Bernstein indicated that those results were consistent with persistent dysfunction of the left lateral antebrachial nerve. Tr. 461. He further indicated that Mr. Piotrowski demonstrated temporary but no long-term improvement with revision neurolysis procedures. Tr. 463. Again, his prognosis was poor.

The treatment record concerning Mr. Piotrowski's left upper-extremity impairment is sparse until May 2013. That month, Mr. Piotrowski demonstrated a positive impingement and Hawkins sign upon examination but full range of motion and no weakness in his shoulder. Tr. 780–81. He also had full range of motion in his

elbow. A second EMG/NCV study revealed persistence, with mild progression, of the left lateral antebrachial cutaneous neuropathy and mild involvement of the left medial antebrachial cutaneous nerve; the remainder of the examination was "within normal limits." Tr. 790, 792. An MRI of the left shoulder showed infraspinatus tendinopathy with a proximal intrasubstance tear and a tiny distal bursal surface tear, a large intramuscular cyst within infraspinatus, subscapularis tendinopathy with a tiny distal partial teat and probable previous tendon repair, and a tiny intrasubstance tear vs. post-operative signal involving the biceps anchor. Tr. 788–89. An x-ray of the left elbow revealed some ossification just volar (i.e., palm-side) to the carpal tunnel. Tr. 791. The elbow MRI showed intact distal biceps tendon repair and common extensor tendinopathy. Tr. 786–87.

Mr. Piotrowski was diagnosed with left lateral epicondylitis, status-post left shoulder surgery with reported superior labral repair and rotator cuff repair, a large intramuscular cyst of the infraspinatus, mild biceps tendinopathy, impingement syndrome, and history of distal biceps tendon repair with subsequent neuropathic pain. Tr. 775–76, 765–66, 778. He received a left lateral epicondylitis injection on May 31, 2013. Tr. 775. Two months later, he received a left elbow autologous blood injection. Tr. 770–71. Mr. Piotrowski, however, continued to demonstrate pain in his shoulder and elbow upon physical examination, Tr. 718–19, 768, and significant limitations in his functional abilities during physical therapy, Tr. 758–59.

On September 16, 2013, Mr. Piotrowski underwent another surgery: left shoulder arthroscopy with extensive debridement, subacromial decompression, mini open biceps tenodesis, and left lateral epicondylitis debridement repair. Tr. 713–17. The following month he demonstrated tenderness and significant tightness and guarding upon examination. Tr. 805–06. Mr. Piotrowski still had mild tenderness during his November exam, but he had full range of motion in his shoulder and elbow. Tr. 802.

In sum, prior to the date last insured, the objective medical evidence concerning Mr. Piotrowski's left upper-extremity impairment reveals mixed findings. Mr. Piotrowski often demonstrated good strength, full or slightly reduced range of motion, and no muscle atrophy upon examination. However, he did have positive laboratory findings that required surgical intervention in January 2009. Mr. Piotrowski's symptoms persisted post-surgery, including the development of issues with his left elbow, and so in September 2013 he underwent a second surgical procedure on his left arm. Given these mixed indicators, the Court concludes that the objective medical evidence, standing alone, is not adequate to support the ALJ's frequent-handling finding regarding Mr. Piotrowski's left upper extremity.

## 2. Activities of daily living

In contrast to the Commissioner's suggestion, the ALJ's frequent-handling finding is not supported by Mr. Piotrowski's activities of daily living. The ALJ concluded that Mr. Piotrowski's activities—including cooking simple meals, performing some household chores, driving a car, shopping for groceries, taking his

dog on walks, gardening, attending church, attending sporting events, spending time with friends, shoveling snow, and thatching his yard—suggested that he should have been able to perform a restricted range of light work. *See* Tr. 23, 24. The ALJ, however, failed to consider Mr. Piotrowski's limitations in performing those activities.

The ALJ purportedly relied on a Function Report completed by Mr. Piotrowski in November 2014. *See* Tr. 19 (citing Tr. 240–48), Tr. 23 (citing Tr. 230–37). In that Report, Mr. Piotrowski indicated that he received help from his wife or son performing several activities (e.g., taking care of the family dog, doing housework, doing yardwork, and gardening), Tr. 231–32, 234, 241–42, 244, and that he had trained himself to use his non-dominant, right hand to prepare his meals, though at a slower pace than if he could use his left hand, Tr. 232, 242. He reported having trouble tucking in his shirt with his left arm, Tr. 231, 241, and stated that, due to his impairments, he could no longer play sports, outdoor games, or billiards, Tr. 235, 245.

At the administrative hearing, Mr. Piotrowski testified to having similar limitations in his daily activities. He indicated that he took his time unloading the dishwasher, didn't fill up the basket when doing laundry, used his right hand to vacuum, and could no longer play sports or garden. *See* Tr. 68–71. Mr. Piotrowski also described dropping a jar of dog food when attempting to reach it from above his microwave and feeling like his arm was going to give when he instinctively grabbed a gallon of milk with his left hand. Tr. 46–47. His arm got fatigued easily, and he

couldn't open a jar of peanut butter or play catch with his son. Tr. 52–53, 60. Mr. Piotrowski also indicated that he had trouble walking his dog because his right hand was not strong enough to rein in his curious beagle. Tr. 63.

The ALJ also erroneously relied on Mr. Piotrowski's willingness to shovel snow and thatch his yard as support for her frequent-handling finding. *See* Tr. 24. Mr. Piotrowski didn't frequently perform these activities and, given his description of other activities, he likely depended on his right upper extremity to get by. Moreover, these activities exacerbated Mr. Piotrowski's symptoms. *See* Tr. 772 (noting that Mr. Piotrowski hurt his left elbow shoveling snow in February 2013), Tr. 827 (noting that Mr. Piotrowski strained his lower back thatching his yard in April 2014), Tr. 926 (noting shoulder issues after shoveling snow in December 2013).

In sum, prior to the date last insured, Mr. Piotrowski's activities of daily living did not demonstrate that he could engage in frequent handling with his left hand. Rather, Mr. Piotrowski's consistent limitations with these activities and reliance on his non-dominant, right hand show that he was quite limited in the use of his left upper extremity. Mr. Piotrowski's daily activities therefore do not support the ALJ's frequent-handling finding.

### 3. Opinion evidence

Multiple doctors opined that Mr. Piotrowski was significantly limited in his ability to use his left upper extremity. Dr. Bernstein, who began treating Mr. Piotrowski's left-arm injury in February 2008, *see* Tr. 458, opined that Mr.

Piotrowski was limited to occasionally lifting twenty pounds with two hands, frequently lifting ten pounds with two hands, and no constant lifting heavier than one pound with his left hand, Tr. 464. Likewise, medical consultants Ronald Shaw, M.D., and Pat Chan, M.D., both concluded that Mr. Piotrowski could lift and carry twenty pounds occasionally and ten pounds frequently but that he was limited in pushing/pulling, reaching, and handling with his left upper extremity. Tr. 100–01, 114–15. Ultimately, Dr. Shaw and Dr. Chan found that Mr. Piotrowski was capable of performing one-armed light work—that is, with his right upper extremity only.

The ALJ accepted in part and rejected in part the doctors' opinions. The ALJ gave "great weight" to Dr. Bernstein's opinion that Mr. Piotrowski could lift up to twenty pounds with both hands and "considerable weight" to the medical consultants' opinions that Mr. Piotrowski could perform light work. Tr. 23–24. However, the ALJ gave "little weight" to the doctors' opinions regarding Mr. Piotrowski's capabilities with his left upper extremity. According to the ALJ, Dr. Bernstein failed to explain the left-arm limitation, and that limitation was inconsistent with "rather good exam reports," Mr. Piotrowski's "ongoing improvement," an August 2009 functional capacity examination that showed Mr. Piotrowski was capable of lifting fifteen pounds with his left arm, and Mr. Piotrowski's daily activities. Tr. 24. Similarly, the ALJ dismissed the medical consultants' left-arm limitation because, in her view, the record showed that "[Mr. Piotrowski's] use of his left upper extremity improved after two successful surgeries," Mr. Piotrowski's left upper extremity "was not useless prior to the date

last insured," and "[Mr. Piotrowski] testified [at the hearing] that he had no problems reaching." Tr. 24.

The ALJ did not provide "good reasons" for discounting the doctors' opinions concerning Mr. Piotrowski's use of his left upper extremity. *See* 20 C.F.R. § 404.1527(c)(2); Social Security Ruling No. 96-2p, 1996 SSR LEXIS 9, at *11 (July 2, 1996) *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). *First*, contrary to the ALJ's decision, Dr. Bernstein did sufficiently explain the basis of his left-hand lifting restriction. Dr. Bernstein examined Mr. Piotrowski a number of times both before and after his 2009 surgery. *See* Tr. 461–89. During the January 2010 examination—the one that contains the restriction in question—Mr. Piotrowski had tenderness and pain in his left shoulder and elbow and positive Hawkins and Neer signs. Tr. 461–62. After citing the results of MRIs and the EMG/NCV study, Dr. Bernstein concluded that Mr. Piotrowski had a poor prognosis with his left elbow because there was no long-term improvement in his symptoms using revision neurolysis procedures. Tr. 463.

*Second*, the ALJ failed to build an accurate and logical bridge between the evidence and her conclusion that Mr. Piotrowski had good exam reports, ongoing improvement, and two successful surgeries. To be sure, clinical findings could fairly be characterized as minimal. But after the first surgery, Mr. Piotrowski continued to complain about and seek treatment for left shoulder pain, and he developed left elbow issues, which were confirmed by diagnostic testing. *See, e.g.*, Tr. 461–72, 477–84, 521–22, 591–97, 671–84, 790–92. And while Dr. Bernstein stated that Mr.

Piotrowski had reached maximum medical improvement regarding his shoulder, he also indicated a poor prognosis for the elbow. Tr. 463. Because of those ongoing issues, Mr. Piotrowski required further surgical intervention on his left arm. *See* Tr. 713–17. The ALJ largely ignored this evidence or cast it in an unreasonably positive light.

*Third*, the 2009 Functional Capacity Evaluation does not, as the ALJ suggests, show that Mr. Piotrowski was capable of lifting fifteen pounds with his left arm. The independent examiner, Carl Kuehmichel, P.T., noted that Mr. Piotrowski had pain when lifting, carrying, pushing, and pulling weights over fifteen pounds. Tr. 535. But it appears from the narrative report and safe-weight chart that Mr. Kuehmichel was referencing two-handed lifts. *See* Tr. 535–36 (differentiating capabilities with the left and right upper extremity and noting that Mr. Piotrowski's right hand was used 80% of the time for the carry test). At any rate, this Evaluation unequivocally documents limitations with and favoring of Mr. Piotrowski's left upper extremity.

*Fourth*, the ALJ ignored limitations Mr. Piotrowski had in his activities of daily living. A complete reading of the record shows that Mr. Piotrowski received help from others or used his non-dominant, right hand to perform many activities. *See supra* section **III.B.2.**  And he did testify to having difficulty reaching for a jar of dog food above his microwave. *See* Tr. 46–47. Mr. Piotrowski's report activities therefore demonstrate significant limitations using his left upper extremity.

*Finally*, the ALJ mischaracterized the medical consultants' findings. The medical consultants did not determine that Mr. Piotrowski's left upper extremity was "useless"; that is not the standard the state agency uses for evaluating impairments. Rather, the medical consultants found that Mr. Piotrowski had specific limitations pushing/pulling, reaching, and handling with his left upper extremity such that he was capable of only one-armed light work. *See* Tr. 100–01, 114–15. Their finding is supported by the record.

In sum, the ALJ unreasonably disregarded medical opinion evidence that contradicted his frequent-handling finding.

### C. Remedy

The Court has reviewed all evidence submitted by the parties and has determined that the record supports only one conclusion: Mr. Piotrowski was disabled from his alleged onset date through his date last insured. This finding is supported by the objective medical evidence, Mr. Piotrowski's allegations, and the opinions of Dr. Bernstein, Dr. Shaw, and Dr. Chan, which together show that Mr. Piotrowski could only occasionally engage in handling with his left upper extremity. And the vocational expert testified that no work would be available for a person with Mr. Piotrowski's age, education, and work experience if he were limited to occasionally handling with one arm. *See* Tr. 80.

This finding is further supported by the ALJ's comments at the administrative hearing. The first hypothetical she posed to the vocational expert— likely the RFC she initially thought was supported by the record—contained an

occasional-handling limitation. *See* Tr. 80. After the vocational expert testified that no jobs would be available to such a person, the ALJ asked: "And what is it about that hypothetical that would prevent other work?" Tr. 80. When told it was the occasional-handling limitation, the ALJ revised her hypothetical ("Okay. Give me one second while I takes notes. Okay, I'm going to start with a new hypothetical. . . ."), removing limitations supported by the record, until she elicited testimony to support an unfavorable decision. *See* Tr. 80–82. A desire to deny benefits is not substantial evidence in support of a decision.

## IV. Conclusion

For all the foregoing reasons, the Court reverses the ALJ's decision and remands the matter to the Commissioner to calculate and award benefits.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the Commissioner's decision is **REVERSED**.

**IT IS FURTHER ORDERED** that this action is **REMANDED** to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to calculate and award benefits

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this <u>26th</u> day of September, 2018.

BY THE COURT:

<u>s/ David E. Jones</u>
DAVID E. JONES
United States Magistrate Judge